UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 20-CR-193(2) (MJD/ECW)

___

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

BENJAMIN RYAN TEETER (2),

        Defendant.

**DEFENDANT TEETER'S POSITION REGARDING SENTENCING**

___

## Introduction

Mr. Teeter was arrested on September 3, 2020 and he has been detained in Sherburne County Jail for more than a year. There is little doubt that Mr. Teeter's being arrested was the best thing that could have happened to him. Mr. Teeter—who had been introduced to the Boogaloo movement a few months before his twenty-first birthday—had been radicalized as a domestic terrorist.

Spending over a year in jail gave Mr. Teeter the opportunity to change his life. He seized that opportunity. He decided, while he remained unhappy with the actions of the federal government, that these beliefs were not going to dominate his life. He decided he did not want to die for this "cause" and wanted to spend as little time imprisoned as he could. He wanted to have genuine connections with people, meaningful romantic relationships, and productive work.

He is doing what he needs to in order to achieve these goals – he was the first co-defendant to plead guilty; he complied with the Court, Probation, and counsel; and he renounced his Boogaloo Bois connection. He has not expressed any anger towards the government, law enforcement, the Court, or other Boogaloo Bois members. He does not blame anyone else for his actions. His friends and family members urge the Court to not incarcerate Mr. Teeter, but he knows he will be spending time in federal prison. He acknowledges that his imprisonment is his fault, and he accepts that. He is focused on moving on.

The defense respectfully submits that these considerations show that there is a path to a peaceful, law-abiding, and non-threatening future for Mr. Teeter. That, when combined with an analysis of the 18 U.S.C. § 3553(a) factors, supports a substantial downward variance from the 240-month imprisonment guideline sentence.

## Legal Standard

The law on sentencing is well-settled. The Court is first to resolve any factual disputes and legal disputes related to the PSR, calculate the statutory minimum and maximum sentences, and determine the corresponding sentencing guidelines range. *United States v. Feemster*, 572 F.3d 455, 460-61 (8th Cir. 2009). Next, the Court is to consider if a departure from the guidelines range is warranted. Finally, the Court is tasked with deciding whether a variance is necessary as it must impose a sentence that is "sufficient, but not greater than necessary" to achieve the statutory sentencing objectives. 18 U.S.C. § 3553(a).

Here, the government had no objections to the PSR and the defense is withdrawing its sole objection—a dispute over whether a two-level enhancement should apply for the provision of dangerous weapons pursuant to U.S.S.G. §2M5.3(b)(1)—accordingly, there are no unresolved PSR objections. All agree that the statutory maximum sentence is 20 years and there is no mandatory minimum sentence. The offense level is 37 due to the operation of the terrorism enhancement. That enhancement also places Mr. Teeter at criminal history category VI even though he has zero criminal history points. The guideline term of imprisonment is 240 months as it is cabined by the statutory maximum.

The issues before the Court, then, are whether there are reasons to depart or vary from the guidelines. The defense submits that the facts of Mr. Teeter's life and the 18 U.S.C. § 3553(a) factors justify a substantially below-guidelines sentence.

## **Factual Timeline**

### Early Life

Mr. Teeter was born in North Carolina in 1998 to a loving and stable household. He has two younger brothers, Zach and Jack, who still live with his parents. (PSR 73). His father has worked in sales for the same company for the past fifteen years, and his mother has a master's degree in school psychology but left the workforce to homeschool Mr. Teeter and his brothers. (PSR 74).

Mr. Teeter's parents had planned to enroll him in an elementary charter school, but after the family did not win the charter school lottery, they decided to homeschool him for a year. His homeschooling went very well, and it continued through high school.

(PSR 79). Mr. Teeter was very independent but socialized through the family church and a home-schooling cooperative. (PSR 74).

Mr. Teeter grew into a young adult. He was a hardworking young man. He worked a number of hourly jobs at places like Panera Bread, Tractor Supply, and Masonboro Homes (a construction business). He was also an intelligent student. He loved debate and mock trial and, for some time, wanted to be a lawyer. (PSR 75). His independence got in the way of that ambition, as he viewed a traditional college experience as arbitrary and impractical. (PSR 75). He also had several co-workers at his hourly jobs who were college graduates, a fact which cemented his feeling of impracticality. (PSR 75). He moved out of his parents' home at age 20 and became mostly financially independent by that time. (PSR 75).

Those who know him describe him as an "'idea person' who was firmly adhered to the principles he valued" and who "sincerely did not want to hurt anyone" (PSR 82); as "compassionate", "introspective", "intelligen[t]" and "confiden[t]." (PSR 83). He has an independent nature – "Ryan marches to a different drum and heard different music." (PSR 83). Letters written by his friends and family corroborate these thoughts in the PSR.

One letter written by "AM" describes Mr. Teeter as "equal parts analytical, focused, compassionate, respectful of peers, authority figures, and institutions", and "a leader" with "a strong work ethic" who "assisted his teammates" and "exhibited kindness." (Support Letters, separately filed, at 1-2). AM noted he volunteered as an assistant coach of the mock trial team after he graduated. (Support Letters at 2).

Another, written by "SR" discussed Mr. Teeter going on week-long mission trips in Mexico through the church, and that Mr. Teeter:

> worked hard alongside the rest of us and became a favorite of the Mexican volunteers and children. One little girl was clinging so tight to Ryan on our last day at the mission compound that she literally had to be peeled out of his arms when it was our time to leave.

(Support Letters at 8-9). SR also discussed when Mr. Teeter became enamored with a kitten he thought was a stray—telling of how Mr. Teeter tried to bring the kitten back home to North Carolina, before (thankfully) learning how the kitten was actually owned by a nearby family, to whom he, of course, returned the kitten. (Support Letters at 8).

Another friend and neighbor, "PH", a military veteran, described Mr. Teeter's actions when Hurricane Florence hit North Carolina in September 2018. PH explained:

> While his family evacuated, Ryan elected to stay behind to take care of their home. During the 90-[mile-per]-hour hurricane Ryan checked on his neighbors making sure everyone was doing okay that didn't evacuate. He found out that my home suffered significant roof damage and I was dealing with several waterfalls coming into the house. Ryan volunteered to bail out water from my attic for 3 days even staying overnight when at times during the storm five-gallon buckets would need to be emptied every 5 minutes. When the storm passed, floodwaters began to rise and we needed to evacuate. Ryan assisted us in moving out of our house with canoes. He canoed a quarter mile back and forth several times getting people, dogs, cats, and our belongings to trucks at the edge of the water. Ryan did not evacuate his flooded home at that time. He elected to stay at this house since it has an upstairs that was dry to patrol and deter looters from breaking into and stealing the little property that people had left. He patrolled in a canoe all night long through our neighborhood. This lasted almost 2 weeks until the water receded.

(Support Letters at 3).

5

Mr. Teeter's Political Beliefs and Transition from Libertarian to "Boogaloo Boi"

Mr. Teeter's parents had ties to the Libertarian Party (when he was 14, his mother was the district coordinator for Gary Johnson's presidential run). Mr. Teeter's independence, emphasis on self-determination, and small government ideals gave him an affinity with that party. (PSR 34). He got involved. And, by age 18, he was a county coordinator for Mr. Johnson's campaign. (PSR 34). He was also elected as an at-large member of the Libertarian Party State Board in North Carolina. (PSR 34).

At this time of his life, his political beliefs were expressed appropriately. (PSR 35). The tenets of his beliefs were ideals like "you know how to run your life better than the government." (PSR 35). He believed a sort of contract law system would be better than a more centralized form of government.

He learned of the "Boogaloo Bois" in 2019 and his Anarcho-Libertarian views got twisted into that organization. As time went on, he got more invested. He and his affiliates protested against what they viewed as governmental overreach in response to the COVID-19 pandemic. (PSR 37). These protests were lawful although odd. The essence of their involvement was a desire to show support to those who had been arrested while protesting. (PSR 37). He and his group were told they couldn't protest with both signs and guns, and they chose to be armed. At that time, Mr. Teeter was still involved in the Libertarian party, but he was being brought away from the more moderate approach.

Travel to Minneapolis; Acceptance of Violence

Mr. Teeter reports being unsure why he was so motivated by the Boogaloo cause rather than simply choosing to live a normal life. He said, "I knew what I didn't want to

6

do, but not what I did want to do, and I had a lot of time on my hands." (PSR 39). It appears that participating in the protests "in North Carolina and then the protests in Minneapolis gave him purpose that he was not experiencing in his day-to-day life." (PSR 39). He believes that his radicalization may have been influenced by the pandemic and related shutdowns: "Honestly, had exactly the same thing [George Floyd's murder and the accompanying protests] happened when everything was open, I'm not sure I would have gone to Minneapolis…It feels like it hit at a time when I made a worse decision that I may not have made at another time." (PSR 39).

Regardless, after George Floyd was murdered, Mr. Teeter saw Boogaloo Bois social media posts encouraging him to go to Minneapolis, and he went. For him, coming to Minneapolis "was a big shiny object…I got disproportionately drawn in because something was finally happening…I could at least be doing something…it felt like a built-up thing." He felt like he was initially having a positive impact by being in Minnesota: "In the beginning, I was doing exactly what I came out to do—just to help protesters…to make the point that if they are going to arrest people for being out, we're going to be out and make it harder for them to be arrested." (PSR 38).

Mr. Teeter readily acknowledges, though, that he went off the rails while in Minneapolis. He "feels that he moved away from his own deeply-held principals and 'made some decisions that were not entirely in keeping with what I espoused…I [made] myself feel like it was alright and did not look at the bigger picture.'" (PSR 40). He "also acknowledged there were several points where he could have made different choices that would not have led him to the proactive and specific support he thought he was providing

7

to Hamas, but 'inertia is a hell of a thing…I would not do it again from a standstill. [There were] a lot of causational factors and higher emotions than I should have had at the time.'" (PSR 41).

In one of Mr. Teeter's letters to his parents from Sherburne County Jail, he eloquently expressed his remorse at what he had done:

> *I made a lot of reckless, thoughtless, and childish decisions in my life, including in my adult life. Reflecting back, I wish I could have matured sooner and avoided the mistakes that started me down that road. I wish I had been ready to listen. I just hope now that I'll be able to fix as many of those mistakes as possible retroactively and set my life on a better path that it was on before I came up here.*

(Support Letters at 7).

As to what Mr. Teeter did while in Minnesota, the PSR accurately lays that out, too. Initially, Mr. Teeter viewed his role as protecting protestors from police overreach. Mr. Solomon put it thusly:

> [C]ops are a lot less likely to try and tread on people's rights when there's other armed Americans with them. So I figured it's about damn time that some, or at least I figured, it's about damn time that some heavily armed rednecks stood with fellow citizens…we definitely don't agree with the looting, but we do agree with the cause of the protestors.

(PSR 26). Likewise, Mr. Teeter said "We're just a group that believes in ultimate, personal freedoms, as long as you're not hurting anybody else[.]" (PSR 25).

Mr. Solomon and Mr. Teeter grew to be friends. Their actions grew more extreme. Their ideologies did, too, as reflected by Mr. Teeter's social media posts. (PSR 29). In June of 2020, the two of them were introduced to a cooperating witness who told them he was part of Hamas. (PSR 12). They believed they could work with the source to achieve

8

their goals (primarily funding for their end goal – a revolution). (PSR 12). Within a couple of months, they were manufacturing suppressors and selling them to the cooperating witness (PSR 16-20), they also discussed destroying a monument as a symbolic gesture—making, and quickly abandoning, a plan to blow up a courthouse when it was uninhabited. The two of them were arrested and indicted later that summer.

Post-Arrest Conduct

Mr. Teeter was arrested while hoping to dismantle the government because he believed it lacked the legitimacy to act. It was far from clear how Mr. Teeter would react to being arrested, indicted, and detained. How he has acted since then speaks volumes about who he is. It can also give the Court confidence about his future.

He stepped back from the Boogaloo Bois, disengaging from the Boogaloo Bois "organization" and from his old beliefs. Over the past year, he has taken consistent and authoritative steps to show that he accepts the federal government's authority to act and that he is amenable to change.

When arrested, he waived his right to a detention hearing and agreed to be detained. He pled guilty—the first "Boogaloo" co-defendant to do so in Minnesota—accepting that his actions were criminal and wrong, that he knew Hamas was a terrorist organization, and that he was not entrapped during the investigation or case. He spoke bluntly with the United State Probation and Pretrial Services Officer about his thoughts, motivations, and actions. He has been—without exception—respectful to the Court, Probation, and Counsel. He has sought to understand why he became a domestic terrorist and expressed that he does not want to go down that path in the future. This change of

heart appears genuine. There are great reasons to have optimism and expect this to continue.

These considerations would be worth highlighting in any case, but they are especially notable in a domestic terrorism case as the underlying basis of Mr. Teeter's actions were grievances against the United States Government.

## Argument

Mr. Teeter's path into radicalization was complex. It is hard to pin down how a young man who was raised to be empathetic, respectful, intelligent, and hardworking had those positive traits twisted and became recruited as a domestic terrorist. Mr. Teeter, himself, a very introspective young man, is not sure what happened. His conduct was truly extreme.

But Mr. Teeter is not a lost cause. There are multiple credible indicators showing there is a realistic and achievable path to normalcy. These can give the Court great hope for Mr. Teeter. The defense specifically points to the three following factors.

*First*, Mr. Teeter has the tools necessary to achieve success post-incarceration. These include both internal factors, such as that he is hardworking, intelligent, and charismatic; and external factors, notably that he has the support of his family and of a community that emphasizes that what Mr. Teeter did was unacceptable, but that they still support Mr. Teeter and want him in the community. That he is still so young affirms that change is not only possible, it is highly achievable.

*Second*, Mr. Teeter is motivated to live a productive, non-criminal life. He has—to the full extent he can—subjected himself to the authority of the government and the Court (he was the first codefendant in the district to plead and he was open and honest with everyone during his more than a year pretrial detention). He will continue to do what he needs to in order to succeed.

*Third*, Mr. Teeter's pre-offense personal history is promising. It is promising for what it includes (a history of selfless acts, kindness towards neighbors, and hard work) and promising for what it does not include (a history of criminal conduct). Mr. Teeter has zero criminal history points, and no convictions or adjudications of guilt.[1] While the terrorism enhancement automatically places him at criminal history category VI, his lack of criminal history nevertheless is appropriate to consider in relation to crafting an appropriate sentence. Indeed, were the "terrorism enhancement" *not* to apply, Mr. Teeter would be at total offense level 25 and criminal history category I, producing a guideline range of 57-71 months.

The advanced data and analytics supplied by the United States Sentencing Commission in a "Recidivism Report"[2] support that he will not reoffend. The data shows a "close correlation" between criminal history and rearrest rates: defendants in criminal

---

[1] His only non-driving offenses were a larceny charge dismissed without admission of guilt and a dismissed charge of accidentally discharging a firearm, during which he was "very forthcoming with all information and cooperative."

[2] *Recidivism among Federal Offenders: A Comprehensive Overview*, UNITED STATES SENTENCING COMMISSION, March 2016 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf).

history category I, with a 33.8% chance of rearrest, are far less likely to reoffend than those in even categories II (54.3%) and III (63.3%), let alone beyond. (Recidivism Report at page 19). Indeed, even amongst Category I defendants there are stark differences – the Commission explained:

> Offenders with zero criminal history points had a lower rearrest rate than offenders with one criminal history point (30.2% compared to 46.9%), a slightly longer recidivism time to rearrest [. . .] and less serious rearrest offenses.

*Id*. at 6. This affirms that Mr. Teeter is capable and likely to act appropriately in the future.

Mr. Teeter does not know exactly what he wants to do post-incarceration, but he knows that he does not want to be in the Boogaloo Bois or any related organization and does not want to spend more time in prison than he needs to.

He reported that he still feels the same political beliefs, but he is motivated to act differently in the future. (PSR 42). "I am definitely of the opinion that people are going to fight their own fight, and I'm not going to be a part of that…[My political involvement] won't go beyond, 'this is how I feel.'" (PSR 42). "He denied an intention to remain involved with any Boogaloo affiliations or events and has found that having a normal life with some freedoms is more important to him. He expressed regret for his behavior and knows certain things will be required of him while he is on supervised release, with which he intends to fully comply." (PSR 42). This is consistent with departing from terrorist groups, which does not always come with an ideological overhaul:

> Horgan drew the important distinction between "disengagement" and "deradicalization." Disengagement is a behavioral change, usually the result

of breaking off participation in terrorism; whereas deradicalization is a cognitive change, usually the result of a reorientation in belief or ideology.

The key finding of his comparative case studies across terrorist groups is that "just as there are multiple routes in" so too are "there multiple routes out." The major reason for leaving terrorist groups is "disillusion from the disparity between fantasy and reality." The disillusionment frequently arises from an assessment that the group's goals are unattainable, revulsion with the group's violent methods, the unrelenting pressure of being in a terrorist group, and the competing loyalties between group and family obligations. These "push" factors need to be complemented by "pull" factors, including: the availability of an exit route, an amnesty or reduced sentence for crimes committed, education and job training, and economic support.

(Josh Horgan, Director, International Center for the Study of Terrorism, *Walking Away: Disengagement and De-Radicalization from Terrorism*, available at https://www.wilsoncenter.org/event/walking-away-disengagement-and-de-radicalization-terrorism). Mr. Teeter has an exit route. He is on it.

A below-guidelines sentence also reflects the statutory goals of sentencing under 18 U.S.C. § 3553(a). A twenty-year sentence, the statutory maximum, would not adequately take into account the history and characteristics of the defendant, *id*. at (1), would be greater than necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, *id*. at (2)(A). Additionally, a substantial downward variance would not create an unwarranted sentencing disparity amongst similarly situated defendants. *Id*. at (6).

Previous defendants convicted of providing material support to a designated foreign terrorist organization in this district have been sentenced to anything from probation (with time in a halfway house) to thirty-five years in prison for attempting to join ISIS. Sentences of less than twenty years are common around the country. For

example, the United States Sentencing Commission has published the average national sentence lengths for "National Defense" convictions, which "includes treason, sabotage, espionage, evasion of military service, prohibited financial transactions and exports, providing material support to designated foreign terrorist organizations, nuclear, biological, and chemical weapons, and weapons of mass destruction."

Table 15 shows the mean sentence length in Fiscal Year 2020 for these National Defense convictions was 38 months (and, where imprisonment was ordered, the mean length of imprisonment was 43 months). The median lengths, respectively, were 24 and 30 months.  (*2020 Annual Report and Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION, at pages 64, 213 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf). A below-guidelines sentence will not create a sentencing disparity. It will, instead, respect the interests of justice and the unique factors of this case.

## Conclusion

The guideline sentence of 240 months would not do justice in this case. Mr. Teeter is, at his core, a good person with a strong moral compass. That moral compass got badly twisted, and a misguided sense of idealism and empathy brought him far down an immoral and illegal path. Mr. Teeter is back on the right path. The defense respectfully submits a substantial downward variance is necessary to balance the interests of justice and the goals of sentencing expressed in 18 U.S.C. § 3553(a).

                                        Respectfully submitted,

Dated: September 20, 2021          /s/ Ian S. Birrell

                                        **Birrell Law Firm PLLC**
                                        Andrew S. Birrell (Attorney No. 133760)
                                        Ian S. Birrell (Attorney No. 0396379)
                                        333 South 7th Street, Suite 2350
                                        Minneapolis, MN 55402
                                        Phone: (612) 238-1939
                                        andy@birrell.law | ian@birrell.law

                                        **Ryan Garry, Attorney, LLC**
                                        Ryan P. Garry (Attorney No. 0336129)
                                        Elizabeth R. Duel (Attorney No. 0393619)
                                        333 South 7th Street, Suite 2350
                                        Minneapolis, MN 55402
                                        Phone: (612) 436-3051
                                        Fax: (612) 436-3052
                                        ryan@ryangarry.com | elizabeth@ryangarry.com

                                        *Attorneys for Defendant*